UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KIERRIA K. [1],⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀No. 1:18-cv-03579-RLY-DLP
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ANDREW M. SAUL, Commissioner of the⠀)
Social Security Administration,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀)

### REPORT AND RECOMMENDATION

Plaintiff Kierria K. requests judicial review of the denial by the
Commissioner of the Social Security Administration ("Commissioner") of her
application for Social Security Insurance Benefits ("DIB") under Title II of the
Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below,
the Undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.⠀PROCEDURAL HISTORY

On January 22, 2015, Kierria filed her initial application for Title II
disability and disability insurance benefits with the Social Security Administration
("SSA"). [Dkt. 6-5 at 3 (R. 176).] After the SSA denied her initial claim, she filed a
request for reconsideration on June 13, 2015. [Dkt. 6-6 at 10 (R. 210).] The SSA
affirmed its initial determination that Kierria was not disabled. [Dkt. 6-5 at 26 (R.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern
District of Indiana has adopted the recommendations put forth by the Court Administration and
Case Management Committee of the Administrative Office of the United States Courts regarding the
practice of using only the first name and last initial of any non-government parties in Social Security
opinions. The Undersigned has elected to implement that practice in this Order.

199).] On September 14, 2015, Kierria submitted a request for a hearing before an Administrative Law Judge ("ALJ"). [Dkt. 6-6 at 16 (R. 216).] The SSA acknowledged receipt of Kierria's request and scheduled a hearing. [Id. at 29 (R. 229).] On April 21, 2017, Administrative Law Judge Shelette Veal conducted Kierria's disability hearing. [Dkt. 6-2 at 36 (R. 35).] At the hearing, Kierria and vocational expert Deborah Dutton-Lambert appeared and testified. [Id. at 41, 61 (R. 40, 60).] On October 26, 2017, the ALJ issued an unfavorable decision denying Kierria's claim for benefits. [Id. at 13-30 (R. 12-29).] Kierria requested a review of the ALJ decision by the Office of Disability Adjudication and Review Appeals Council on November 21, 2017. [Dkt. 6-6 at 64 (R. 264).] On September 19, 2018, the Appeals Council denied Kierria's request for review, making the ALJ's decision final. [Dkt. 6-2 at 2 (R. 1).] The Plaintiff now seeks judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.    STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national

economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also*, 20 C.F.R. § 404.1520 (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not,

at step five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Kierria is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336

F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.   BACKGROUND

#### A. Kierria's Medical History

Kierria has a history of ongoing mental health treatment for both bipolar disorder and manic episodes stemming back to September 2010. [Dkt. 6-10 at 4 (R. 440).] On September 26, 2010, Kierria was admitted to Bloomington Hospital due to manic behavior. [Id. at 12 (R. 448).] After becoming stabilized, Kierria was discharged on September 30, 2010, and instructed to engage in outpatient follow-up care. [Id.] Kierria began outpatient treatment at Bloomington Meadows with Dr. Sims and later, Dr. Jason Mensah. [Id. at 61 (R. 497).]

On June 8, 2011, following an argument with her husband and a self-inflicted overdose on prescription medication, Kierria was admitted to St. Francis Hospital

in Mooresville, Indiana. [Dkt. 6-10 at 59, 61 (R. 495, 497).] While at the hospital, Dr. Jonathon Bevers conducted a psychiatric evaluation of Kierria, placed her in adult group and activity therapy, and provided ongoing chemical dependency education. [Id. at 59 (R. 495).] During her psychiatric evaluation, Kierria reported to Dr. Bevers that she had attempted to overdose not to kill herself but simply to get her husband's attention. [Id. at 61 (R. 497).] Kierria also noted that she had struggled with substance abuse over the past several years. [Id.] During the examination, Dr. Bevers noted that Kierria's thought processes were logical and coherent and she was oriented to person, place, and time with recent, remote, and immediate recall intact. [Id.] Dr. Bevers recommended acute care for five days, and suggested outpatient aftercare plans. [Id. at 62 (R. 498).] Dr. Bevers discharged Kierria on June 13, 2011 noting that she was medically stable and reported no evidence of suicidal ideation, homicidal ideation, or psychosis. [Id. at 59; 63 (R. 495; 499).]

Between May 31, 2012 and December 11, 2013, Kierria attended nine medication management and psychiatric treatment sessions with the Meadows Psychiatric Associates Outpatient Medicine Management Program in Bloomington, Indiana. [Dkt. 6-10 at 64-75 (R. 500-511).] At her visit on August 24, 2012, Kierria reported to Dr. Mensah that she was doing well on her current medications, and was optimistic about starting an upcoming master's program. [Id. at 68-69 (R. 504-505).]

On October 29, 2012, Kierria noted that she was frustrated with her current temporary employment at a warehouse, but was looking forward to her new job

which was scheduled to start in a few weeks. [Dkt. 6-10 at 70 (R. 506).] During the assessment, Clinical Nurse Specialist Marsha Cummins noted that Kierria was stable on her current medications; that her thought processes were logical; her thought content appropriate; and that her concentration was good. [Id.] Nurse Cummins also reported Kierria's impulse control and judgment to be good and her intelligence was above-average. [Id.] Nurse Cummins recommended outpatient treatment counseling with Cheryl Mansell, a licensed social worker. [Id.]

On February 14, 2013, following an evaluation, Nurse Cummins noted Kierria's loss of employment, stress with being a full-time student, and reduced activities of daily living due to her mental health. [Id. at 71 (R. 507).] Nurse Cummins modified Kierria's medications and recommended continued outpatient treatment with Cheryl Mansell. [Id.]

On March 18, 2013, Kierria met with Nurse Cummins and reported that she was suffering from lack of sleep, financial stressors with an inability to afford medications, and ineffectiveness of her current prescriptions. [Id. at 72 (R. 508).] Nurse Cummins modified Kierria's medications and recommended that she continue her outpatient services with Ms. Mansell. [Id.]

During her visit with Nurse Cummins on June 5, 2013, Kierria reported several panic attacks following her promotion to supervisor at work. [Id. at 73 (R. 509).] Nurse Cummins noted that Kierria's thought content was appropriate and that she was future oriented; her concentration was good; her judgment and impulse control were good; and her intelligence was average. [Id.] Nurse Cummins

reviewed Kierria's medications and recommended that she continue her outpatient services with Ms. Mansell. [Id.]

During her next visit on August 8, 2013, Kierria reported to Nurse Cummins that she felt better than she had in a long time. [Id. at 74 (R. 510).] Nurse Cummins recommended that Kierria stay on her current medications as prescribed and continue therapy with Ms. Mansell. [Id.] In the December 11, 2013 treatment note, Kierria reported to Nurse Cummins that she had lost her job in November, but was doing well considering the circumstances and that she had almost finished her academic requirements to obtain a master's degree. [Id. at 75 (R. 511).] Nurse Cummins noted no changes in her mental status examination regarding concentration, judgment, orientation, thought content, or orientation. [Id.] Nurse Cummins recommended that Kierria continue her medications and outpatient services with Ms. Mansell. [Id.]

On May 13, 2014, Kierria visited with Clinical Nurse Specialist Stephena "Bunny" Sheets with Indiana University Health Physicians Behavioral Care – South.[2] [Dkt. 6-12 at 19 (R. 602).] Kierria explained that she needed a medical professional because Nurse Cummins had left Bloomington Meadows. [Id.] Kierria also advised that she had been visiting a therapist, Cheryl Mansell, over the past several years. [Id.] During the intake process, Kierria told Nurse Sheets that she had been diagnosed with bipolar disorder in 2010, and had a history of narcotic abuse. [Id.] Kierria represented to Nurse Sheets that she had been clean and sober for three years. [Id.] According to Kierria, it was the narcotic abuse that had caused

---

[2] Formally named Indianapolis Psychiatrics Associates – South.

8

her to steal medication from her former employer, a pharmacy, and resulted in her criminal conviction for theft in 2006. [Id.] Kierria explained that not being able to secure employment because of her criminal history was the biggest source of stress. [Id.] Nurse Sheets noted that Kierria's current medical regimen was helpful, but that Kierria had not been following it for the past two months because her prescriptions were allegedly stolen when her home was burglarized. [Id.] Nurse Sheets ordered Kierria's medical records from Bloomington Meadows. [Id. at 20 (R. 603).] Nurse Sheets found Kierria's attitude cooperative, friendly, and pleasant; her insight fair; her thought process to be appropriate, future-oriented, and goal-directed. [Id. at 21 (R. at 604).] Nurse Sheets confirmed the diagnosis of bipolar I disorder and recommended that Kierria stay on her current medications and engage in individual therapy. [Id. at 21-22 (R. at 604-05).]

A few days later, on May 20, 2014, Kierria and her husband met with Nurse Sheets for a follow-up medication evaluation for Kierria's bipolar disorder. [Id. at 11 (R. 594).] Kierria's husband reported that Kierria's bouts with forgetfulness had become so severe that he had placed a GPS tracking system on Kierria's phone. [Id.] Kierria also reported her recent high-risk behaviors including meeting up with people on Craigslist. [Id.] Kierria's husband noted that he is a truck driver and is gone a lot during the week, and was concerned with Kierria's thoughts of self-harm. [Id.] Kierria explained that she believed her husband's actions were controlling, but agreed that her behavior could get her into legal trouble or result in self-harm. [Id.] Finding her insight good, judgment intact, and thought processes appropriate,

9

Nurse Sheets advised Kierria to consider partial hospitalization at Valle Vista to address these issues. [Id. at 11-12 (R. 594-95).]

The next day, on May 21, 2014, Kierria was voluntarily admitted into the Valle Vista Health partial hospitalization program after reporting delusions, suicidal and homicidal thoughts, hallucinations, and dissociative episodes. [Dkt. 6-11 at 3 (R. 513).] After attending one full session and one-half day of the partial hospitalization program, Kierria requested to be discharged. [Id.] Valle Vista's therapist, Elizabeth Wilkinson, noted that Kierria was intrusive, monopolizing, and often made rude comments toward peers. [Id. at 30 (R. 540).] Kierria continually emphasized her daily use of marijuana and appeared impaired. [Id. at 4 (R. 514).] Ms. Wilkinson noted that Kierria demanded to be discharged if Valle Vista was unwilling to give her the medications that she desired so that she could find a place that would give them to her. [Id.] Kierria was discharged on May 22, 2014 and given aftercare plans, including abstaining from all substance and alcohol use, following up with a referral to Centerstone Columbus for counseling services, and attending 12 Step meetings. [Id.]

Later that day, Kierria met with Nurse Sheets at the IU Health Physicians Behavioral Health – South office. [Dkt. 6-12 at 8 (R. 591).] Nurse Sheets noted that Kierria had been asked to leave Valle Vista because of her belligerence. [Id.] Even though Valle Vista found Kierria not to be suicidal, Kierria's husband believed that she was becoming more unstable. [Id.] Nurse Sheets referred Kierria for inpatient

treatment with Dr. Andrew Miller of Indiana University Health Physicians Behavioral Care – IUH Methodist Hospital. [Dkt. 6-11 at 62 (R. 572).]

During his initial intake on May 22, 2014, Dr. Andrew Miller advised Kierria that her continued substance abuse, specifically marijuana, likely altered the effect of her current medications and her psychiatric ability to remain stable. [Id. at 63 (R. at 573).] Kierria became agitated and tearful and left the room, which terminated the interview. [Id.] Dr. Miller noted that Kierria was uncooperative, and that the physical examination was not able to be completed. [Id.] Dr. Miller noted that Kierria was diagnostically challenging because of her shifting behavior as the interview progressed. [Id. at 64 (R. at 574).] Dr. Miller ordered her admitted for inpatient service for continued observation, and that her medications be continued. [Id.]

While in inpatient care, on May 26, 2014, Kierria was evaluated by Dr. Anita Glasson at IU Health Methodist Hospital. [Id. at 66 (R. 576).] During the mental status examination, Dr. Glasson noted that Kierria's mood was better; judgment was fair; attitude was cooperative and pleasant; and thoughts were slower. [Id.] On May 27, 2014, after determining that Kierria had reached the maximum benefit of inpatient stay, Dr. Glasson discharged Kierria, diagnosing her with bipolar I disorder, and ordered her to follow up as an outpatient. [Id. at 72-73 (R. 582-83).] During discharge, Dr. Glasson noted that Kierria was calm and cooperative with the evaluation and that she showed no abnormal psychomotor behavior. [Id. at 73 (R. 583).] Dr. Glasson further noted that Kierria's affect was fairly bright; her mood

was good; and she did not have any homicidal or suicidal ideation. [Id.] Finally, Dr. Glasson noted that Kierria's insight and judgment had improved. [Id.] Kierria was scheduled for an appointment with Indianapolis Psychiatric Associates West Office on June 2, 2014, and an appointment with Nurse Sheets on June 17, 2014. [Id.]

On June 17, 2014, Kierria underwent a follow-up medical evaluation with Nurse Sheets for bipolar disorder and personality disorder. [Dkt. 6-12 at 5 (R. 588).] Kierria reported improvement in her symptoms, but noted concern with her husband's issues with depression. [Id.] Nurse Sheets noted that Kierria's affect was congruent with her stated mood; her judgment was intact; she was cooperative and friendly; and displayed no auditory or visual hallucinations, homicidal ideation, self-injurious behavior, or suicidal ideation. [Id. at 6 (R. 589).] Nurse Sheets reported Kierria's thought process to be appropriate, future-oriented, and goal-directed and that Kierria's bipolar disorder had improved. [Id.] Nurse Sheets scheduled a follow-up appointment in two to three weeks, and recommended that Kierria continue her current medications, individual therapy, and group therapy. [Id. at 7 (R. 590).]

On July 18, 2014, Kierria met with Nurse Sheets and reported that she had just completed a relaxing two-week trip with her husband. [Id. at 39 (R. at 622).] Nurse Sheets noted that Kierria's attitude was cooperative and friendly; her judgment was much improved; and that Kierria was oriented, maintained a good fund of knowledge, had good abstracting ability, a level of high, above average intelligence, and memory recall. [Id. at 41 (R. 624).] Nurse Sheets recommended

individual therapy, group therapy, a continuation of current medications, and returning Kierria to the intensive outpatient program. [Id. at 42 (R. 625).]

On August 11, 2014, Dr. Olufunke BrimmoLonge, of Indiana University Health Physicians Behavioral Care – IUH Methodist Hospital, met with Kierria for an initial consultation regarding her proposed placement in a partial hospitalization program. [Dkt. 6-14 at 8 (R. 706).] Dr. BrimmoLonge confirmed Kierria's bipolar disorder diagnosis, noted her dependence on marijuana and opiates, and gave her a Global Assessment of Functioning ("GAF") of 40.[3] [Id.] Kierria reported episodes of anxiety attacks, a lack of concentration and motivation to do anything, and her desire to "be manic again." [Id.] During the mental status examination, Dr. BrimmoLonge noted that Kierria's judgment was limited; that she expressed passive suicidal ideation; and her mood was depressed. [Id. at 10 (R. 708).] Dr. BrimmoLonge adjusted her medications and prescribed Paxil for depressive anxiety symptoms, Klonopin for anxiety symptoms, Trileptal for mood stabilization, and Geodon for psychosis and mood stabilization. [Id. at 12 (R. 710).] Dr. BrimmoLonge recommended that Kierria continue her participation in an intensive outpatient program, comply with the recommendations and medications to promote optimal care and response, and engage in group activities. [Id. at 11 (R. 709).] Dr.

---

[3] The Global Assessment Functioning scale reports a clinician's assessment of an individual's overall level of functioning. *Sims v. Barnhart*, 309 F.3d 424, 427 n. 5 (7th Cir. 2002) (citing *Bartz v. Colvin*, No. 11-CV-123-WMC, 2013 WL 6449000, at *1 (W.D. Wis. Dec. 9, 2013). A GAF of 21-30 indicates inability to function in almost all areas; 31-40 indicates major impairment in several areas; 41-50 indicates serious symptoms; 51-60 indicates moderate symptoms; and 61-70 indicates mild symptoms. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders 34* (4th ed. 2000) (Text Revision).

13

BrimmoLonge noted that Kierria refused to participate in the partial hospitalization program. [Id.]

On August 18, 2014, Kierria visited with Dr. BrimmoLonge and complained of being "tired, feel[ing] like she has bricks in her feet, hard to get going." [Id. at 14 (R. 712).] During the depression screening, Dr. BrimmoLonge noted Kierria's feelings of worthlessness, a depressed mood, tearful demeanor, and diminished ability to concentrate. [Id. at 16 (R. 714).] Dr. BrimmoLonge explained that Kierria's judgment had improved, her insight regarding marijuana was improving, her level of intelligence was average, and her thought processes were appropriate. [Id.] He adjusted her medications, and recommended that she continue to participate in intensive outpatient program and comply with her medication to promote optimal care. [Id. at 17 (R. 715).]

On September 22, 2014, Kierria met with Nurse Sheets for a medication evaluation. [Dkt. 6-15 at 96 (R. 883).] Nurse Sheets noted Kierria's diminished ability to concentrate and that she reported struggling with focus and attention, but felt she was doing a bit better with Geodon. [Id.] Nurse Sheets documented Kierria's mood to be dysphoric and her affect was congruent with her stated mood; Kierria's fair judgment and cooperative and friendly attitude; no suicidal or homicidal ideations in her thought content; and an appropriate, goal-oriented thought process. [Id. at 98 (R. 885).] Nurse Sheets scheduled a follow-up appointment and recommended adding Wellbutrin along with continuing Kierria's current medications and individual therapy. [Id. at 96, 99 (R. 883, 886).]

On October 21, 2014, Kierria met with Staci Leigh Vanzant, a licensed social worker, for a psychotherapy session at Indiana University Health Physicians Behavioral Care – IUH Methodist. [Id. at 94 (R. 881).] During the visit, Kierria reported feeling anxious and "trapped since she is not able to find work or maintain work at this time and depends on her husband for most things." [Id.] Kierria also reported she stopped taking her medications a month prior because she was "hoping to get that high manic feeling again," but was only feeling depressed. [Id.] During Kierria's mental status examination, Ms. Vanzant noted her tearful affect; cooperative attitude; fair judgment; no suicidal or homicidal ideations or self-injurious behavior; and a future-oriented thought process. [Id. at 94-95 (R. at 881-82).] Ms. Vanzant recommended individual therapy and urged Kierria to make an appointment with her prescriber to follow up on her medications. [Id. at 95 (R. 882).]

Kierria visited Ms. Vanzant on October 29, 2014 for a psychotherapy session, reporting that she resumed taking her medications since their last session and was feeling an improvement in her depressive symptoms. [Id. at 92 (R. 879).] During the mental status examination, Ms. Vanzant noted Kierria's tearful affect, unstable mood, good eye-contact, and well-groomed appearance. [Id.] Kierria discussed arguments with her husband and continuing to struggle with their relationship. [Id.] She admitted to smoking marijuana to calm herself, and acknowledged Dr. BrimmoLonge's advice that she should not smoke marijuana. [Id.] Ms. Vanzant

explained that marijuana will decrease the efficacy of Kierria's medications and recommended individual therapy and to continue her current medications. [Id.]

Kierria met with Nurse Sheets on November 10, 2014 for a medication evaluation. [Id. at 88 (R. 875).] During the check-up, Kierria reported that her medications were keeping her mood reasonably stable, although she continued to experience bouts of depression with no hypomania or mania. [Id.] During the mental status examination, Nurse Sheets noted Kierria's dysphoric mood; cooperative and friendly attitude; high level of intelligence; lack of suicidal or homicidal ideations; and her appropriate, goal-oriented thought process. [Id. at 90 (R. 877).] She recommended individual therapy and for Kierria to continue her current medications. [Id.]

On January 27, 2015, Nurse Sheets and Dr. BrimmoLonge agreed to recommend Kierria for electroconvulsive therapy[4] ("ECT") and notified Kierria as such. [Id. at 83 (R. 870).] Nurse Sheets sent a pre-ECT worklist and laboratory test request to Dr. Idella Simmons of Idella Simmons, MD Family Medicine, LLC. [Dkt. 6-13 at 24 (R. 673).] On January 29, 2015, Kierria visited Dr. Idella Simmons for a physical examination in preparation for ECT treatment. [Id. at 3-8 (R. 652-657).]

On January 30, 2015, Kierria met with Ms. Vanzant for a psychotherapy session. [Dkt. 6-15 at 81 (R. 868).] During the session, Kierria reported "I've done therapy, pharmacotherapy, and cannoid (sic) therapy, but nothing has worked so I

---

[4] Electroconvulsive therapy, also known as electroshock therapy, is a medical procedure that gives the brain electrical stimulation to help with depression, manic-depressive illness, and schizophrenia. Indiana University Health, *Electroconvulsive Therapy (ECT)*, https://iuhealth.org/find-medical-services/electroconvulsive-therapy.

want to try ECT." [Id.] Ms. Vanzant noted that Kierria did not show insight into the need to be consistent and work on issues between therapy sessions or why no one supports her marijuana use. [Id.] During the mental status examination, Kierria exhibited a flat and tearful affect with cooperative attitude; poor insight; depressed mood; no suicidal or homicidal ideations; and future-oriented thought process. [Id. at 81-82 (R. 868-69).] Ms. Vanzant recommended individual therapy and continuation of Kierria's current medications. [Id. at 82 (R. 869).] She also informed Kierria that her last day would be March 4, 2015, and Kierria agreed to switch to another therapist. [Id. at 81 (R. 868).]

On February 2, 2015, Kierria underwent a computed tomography ("CT") scan of her head performed by radiologists Drs. Lyndsay Oancea and Aaron Kamer prior to starting ECT. [Dkt. 6-12 at 53 (R. 636).] The CT scan revealed no hemorrhaging or evidence of intracranial infarction. [Id.]

Kierria met with Nurse Sheets on February 10, 2015 for a medication check-up. [Dkt. 6-15 at 77 (R. 864).] Kierria expressed feeling a bit better with Risperdal and having some muted suicidal thoughts. [Id.] Kierria reported she completed her ECT workup. [Id.] Nurse Sheets noted a depressed mood with congruent affect; cooperative and friendly attitude; good judgment; no suicidal or homicidal ideations; and appropriate, future and goal-oriented thought processes. [Id. at 79 (R. 866).] Nurse Sheets recommended individual therapy and for Kierria to continue her current medications with the recommendation to increase the

17

Risperdal dose. [Id. at 80 (R. 867).] She further noted that Kierria was waiting to hear about ECT treatment from Methodist Hospital. [Id.]

Kierria reports she underwent ECT treatment, though documentation of those treatments was not provided. [Dkts. 6-5 at 12 (R. 185); 6-12 at 61 (R. 664).] On March 16, 2015, Kierria met with Nurse Sheets for a medication check-up. [Dkt. 6-15 at 73 (R. 860).] During that visit, Kierria reported having just finished her eleventh ECT treatment and described an improvement in her mood with no suicidal thoughts. [Id.] Nurse Sheets noted that Kierria's chief complaint was post-ECT memory issues. [Id.] Nurse Sheets documented Kierria's improved mood; cooperative and friendly attitude; fair judgment; lack of suicidal or homicidal ideations; and appropriate and future-oriented thought process. [Id. at 75 (R. 862).] Nurse Sheets scheduled a follow-up appointment and recommended individual therapy and continuing with current medications. [Id. at 76 (R. 863).]

On April 6, 2015, Kierria began seeing a new licensed social worker, Charles Warfield ("Mr. Warfield"), for psychotherapy sessions. [Dkt. 6-15 at 70 (R. 857).] During the initial intake, Kierria informed Mr. Warfield that she had completed ECT as an outpatient and that she was feeling less depressed. [Id.] Kierria also expressed that was functioning better because her routine was more normalized. [Id.] She expressed that in a way, "she misses her manic episodes," but that she was getting used to the "new normal." [Id.] Kierria agreed to monthly sessions with Mr. Warfield. [Id.] During the mental status examination, Mr. Warfield noted an improved mood; cooperative attitude; and fair judgment. [Id. at 71 (R. 858).] He

recommended individual therapy, social lifestyle changes, and for Kierria to continue with her current medications and medication evaluations. [Id.]

On May 4, 2015, Kierria visited Floyd F. Robison, Ph.D., with LPS Behavioral Health LLC for a psychological consultative examination. [Dkt. 6-12 at 61-65 (R. at 644-648).] During that visit, Kierria reported "persistent, severe anxiety, depression, and a previously diagnosed bipolar disorder, all of which interfered with her daily activities." [Id. at 61 (R. at 644).] During that visit, Kierria also reported daily or near-daily periods of manic symptoms, poor appetite, issues with sleep, feelings of worthlessness, suicidal ideation, and poor concentration. [Id. at 63 (R. at 646).] Dr. Robison's diagnostic impressions included major depressive disorder, single episode, chronic, severe with mixed features and borderline personality disorder. [Id. at 64 (R. at 647).] He found that Kierria was fully capable of following simple instructions; adequately capable of following complex instructions; fully able to make simple decisions independently; and adequately able to perform normal, age-appropriate hygiene tasks, routine domestic tasks, and tasks in the community. [Id.] Dr. Robison also found that her pace and persistence were fair. [Id.] Dr. Robison noted, however, that Kierria was less than adequately able to speak and behave appropriately with and around others; respond appropriately to supervisory feedback and instruction; and manage conflicts. [Id.] Dr. Robison concluded that Kierria was capable of creating and maintaining a regular schedule of activities without others' direction or supervision. [Id.]

On June 1, 2015, Kierria visited Nurse Sheets for a medication check-up. [Dkt. 6-13 at 42 (R. 691).] During that visit, Nurse Sheets noted that Kierria's mood was "essentially stable," and that Kierria was feeling a little down since the death of her husband's grandfather. [Id.] Nurse Sheets also noted that Kierria began seeing Charles Warfield for cognitive behavioral therapy. [Id.] She noted a mildly dysphoric mood secondary to bereavement; cooperative attitude; good insight and judgment; and no suicidal or homicidal ideations. [Id. at 44-45 (R. 693-94).] Nurse Sheets recommended individual and marital therapy and to continue with medications. [Id. at 45 (R. 694).]

On June 17, 2015, Kierria met with Mr. Warfield for a psychotherapy session. [Id. at 63 (R. 850).] During that session, they discussed Kierria's ongoing marital issues and recent arguments with her husband. [Id.] Kierria agreed to bring her husband to their next session to discuss how to improve their communication patterns. [Id.] Mr. Warfield noted Kierria's tearful affect; cooperative attitude; fair judgment; and depressed and irritable mood. [Id. at 64 (R. 851).] He recommended individual and marital therapy, social lifestyle changes, and for Kierria to continue with her current medications and medication evaluations. [Id.]

Kierria brought her husband to her June 24, 2015 session with Mr. Warfield, where the three discussed communication patterns and worked through communication issues. [Id. at 56 (R. 843).] During the session, Mr. Warfield noted Kierria's tearful affect; anxious mood; cooperative attitude; fair insight and judgment; and appropriate thought process. [Id. at 57 (R. 844).] Mr. Warfield again

20

recommended individual and marital therapy, social lifestyle changes, and for Kierria to continue with her medications and medication evaluations. [Id.]

On July 23, 2015, Kierria visited Mr. Warfield for a psychotherapy session. [Dkt. 6-15 at 53 (R. 840).] Kierria reported that there were no major problems since the last session. [Id.] Kierria stated she felt "sluggish," and Mr. Warfield encouraged her to begin eating breakfast to help increase her energy level throughout the day. [Id.] In the mental status examination, Mr. Warfield noted Kierria's cooperative attitude, fair insight and judgment, improved mood, and appropriate thought process. [Id. at 54 (R. 841).] He recommended individual therapy, social lifestyle changes, and for Kierria to continue with her medications and medication evaluations. [Id.]

Kierria continued to regularly attend psychotherapy sessions with Mr. Warfield and medication check-ups with Nurse Sheets between July 23, 2015 and March 1, 2017. [Dkts. 6-14 at 23-90 (R. 721-788); 6-15 at 2-52 (R. 789-839).]

**B. Factual Background**

Kierria was twenty-seven years old as of her alleged onset date of November 14, 2013, and is thirty-three now. [Dkt. 6-5 at 3 (R. 176).] She earned a bachelor's degree from Indiana University-Purdue University Indianapolis. [Id. at 8 (R. 181).] She has relevant past employment as a home health certified nursing assistant, pharmacy technician, and test evaluator. [Dkt. 6-8 at 5, 54 (R. 287, 336).]

21

### C. ALJ Decision

In evaluating Kierria's benefit claims, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and ultimately concluded that Kierria was not disabled. [Dkt. 6-2 at 17-30 (R. 16-29).] At step one, the ALJ found that Kierria met the insured status requirements of the Social Security Act through December 31, 2018 and had not engaged in substantial gainful activity since her alleged onset date, November 14, 2013. [Id. at 18-19 (R. 17-18).] At step two, the ALJ determined that Kierria suffered from severe mental impairments, including bipolar disorder, mixed personality disorder, and anxiety. [Id. at 19 (R. 18).] The ALJ further determined that Kierria did not suffer from severe physical impairments, though she alleged a disability due to high blood pressure and acid reflux. [Id.]

At step three, the ALJ found that Kierria's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, or 404.1526. [Id.]

After step three but before step four, the ALJ found that Kierria had the residual functional capacity ("RFC") to "perform less than the full range of light work" with the following limitations:

- Occasionally lifting up to twenty pounds;

- Frequently lifting or carrying up to ten pounds;

- Standing or walking six hours;

- Sitting for six hours;

22

- Understanding, carrying out, and remembering simple, routine, and repetitive tasks involving only simple work-related decisions;

- No fast-moving assembly line type work;

- Occasional interaction with supervisors, co-workers, and the public.

[Id. at 21 (R. 20).]

At step four, relying on the testimony of the vocational expert, the ALJ concluded that Kierria was precluded from performing her past relevant work as a pharmacy technician, grading clerk, and certified nursing assistant. [Id. at 28 (R. 27).]

At step five, the ALJ determined that, considering Kierria's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy, such as a housekeeper, merchandise marker, or router that Kierria could perform. [Id. at 29 (R. 28).] Accordingly, the ALJ determined that Kierria was not disabled. [Id.]

## IV. ANALYSIS

Kierria challenges the ALJ's decision by arguing that the ALJ failed to properly analyze her combination of impairments in computing her RFC. First, she asserts an absenteeism argument, claiming that the ALJ failed to acknowledge that her frequent mental health treatment appointments prevented her from maintaining a steady work schedule. Second, Kierria claims that the ALJ failed to give proper weight to the opinion of Kierria's medical sources. Lastly, the Plaintiff asserts that the ALJ failed to address the effects of stress in the workplace, her

23

limitations with concentration, persistence, and pace, and her aggression symptoms in her computation of Kierria's RFC. The Undersigned considers these arguments in turn below.

### A. Whether the ALJ Needed to Address Kierria's Ability to Sustain Work.

First, Kierria argues that the ALJ erred by failing to address a line of evidence demonstrating that she is unable to maintain a steady work schedule in accordance with the vocational expert's testimony about attendance and on-task tolerance in the competitive workforce. [Dkt. 8 at 21.] Specifically, Kierria argues that evidence of her needing to see a psychiatrist every few months, meeting with her case manager every week, and attending weekly individual therapy appointments demonstrates her inability to sustain work. [Id. at 20.] In her brief, Kierria cites to fifty-nine instances wherein she attended medical appointments between May 13, 2014 and March 1, 2017. [Id. at 21-23.] She maintains that necessary treatment occurring two to four times per month, including therapy sessions lasting fifteen to forty-five minutes each; medication evaluation visits; and time away from work preclude her from being able to maintain full time employment. [Id. at 23.] Kierria concludes that she attends "too much treatment on a regular basis to allow her to maintain a steady work schedule," and the ALJ erred by not including this limitation in her RFC computation. [Id. at 20.]

In response, the Commissioner argues that the Plaintiff has failed to demonstrate that her need to attend short, weekly outpatient therapy appointments prevents her from maintaining competitive employment. [Dkt. 15 at 12.] The

Commissioner maintains that Kierria has failed to demonstrate that attending these appointments would require her to miss an entire day of work. [Id.]

An ALJ does not need to discuss every piece of evidence in the record. *Karen A. R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *4 (S.D. Ind. July 26, 2019) (citing *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)). The SSA, however, has provided guidance as to what must be considered and articulated:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., eight hours a day, for five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Social Security Ruling 96-8p (S.S.A. July 2, 1996). "Nearly every claimant requires treatment for their impairments. When an ALJ assesses an RFC that does not include the need for absences or breaks, it can be inferred that the ALJ did not credit the need for further relevant limitations." *Gary B. v. Berryhill*, No. 1:18-cv-00833-JMS-TAB, 2018 WL 4907495, at *3 (S.D. Ind. Oct. 10, 2018).

It would be a needless formality to require the ALJ to articulate in every decision how he or she concluded that necessary treatment visits could be attended while attending a full-time work schedule. *Id.* An ALJ may, however, "be obligated to address a claimant's ability to sustain work, if the claimant presents sufficient evidence demonstrating that the ability would be precluded by treatment visits which are necessitated by the claimant's impairments." *Gary B.*, 2018 WL 4907495,

25

at *4. "Necessary visits may preclude sustaining work if they are too frequent or otherwise cannot be scheduled around a full-time competitive work schedule, including if those visits regularly occur on an emergency or otherwise unpredictable basis." *Id.*

In this case, Kierria provided a treatment log which consisted of fifty-nine mental health appointments between May 13, 2014 and March 1, 2017 [Dkt. 8 at 21-23.] Kierria also submitted a narrative report from her treating providers, Mr. Warfield and Nurse Sheets, which provided that Kierria would be unable to perform "work-related activities now or in the forcible [sic] future" due to her severe and unremitting mental health symptoms. [Dkt. 6-16 at 31-32 (R. 918-19).] Kierria also provided a mental impairment questionnaire completed by Nurse Sheets which indicated that Kierria's severe impairments or treatment would cause her to be absent from work more than four days per month. [Id. at 30 (R. 917).] At the hearing before the ALJ, the vocational expert testified that absenteeism for at least three or more days per month or being off task greater than fifteen percent of the work day would preclude employment in the national economy. [Dkt. 6-2 at 67 (R. 81).]

In *Donielle H. v. Berryhill*, the Plaintiff argued that her treatment, which occurred two to three times per month and involved her attending individual therapy sessions lasting forty to fifty minutes each, and medication management visits with a psychiatrist, lasting fifteen minutes, precluded her from sustaining work in the competitive workforce." No. 1:18-cv-2990-JPH-TAB, 2019 WL 1614640,

at *4 (S.D. Ind. Apr. 15, 2019). The plaintiff claimed that the ALJ "erred when she failed to address the [p]laintiff's ability to sustain work while attending necessary treatment visits." *Id*. This Court found the evidence presented was insufficient to trigger the ALJ's duty to address the plaintiff's ability to sustain work while receiving treatment. *Id*. The Court stated that the plaintiff "did not present any evidence that the necessary treatment needed to occur during working hours or could not have been scheduled around a full-time work schedule." *Id*.

In the present case, the evidence also fails to show why Kierria's mental health treatment appointments must occur during work hours and cannot be arranged around a work schedule. There is no evidence that Kierria's treatment is needed on an emergency or unpredictable basis. The fact alone that Kierria must attend treatment sessions and medication management appointments does not give rise to a material inconsistency with her ability to sustain work that needs to be reconciled. A claimant is unable to demonstrate an inability to sustain work by simply relying on a large number of medical visits. *Hoppa v. Colvin*, No. 12-cv-847-bbc, 2013 WL 5874639, at *5 (W.D. Wis. Oct. 31, 2013). If that were the case, claimants could manufacture their own disabilities simply by going to the doctor as often as possible for any or no reason. *Id*.

As addressed later in the decision, the ALJ gave little weight to the opinions of Nurse Sheets and Mr. Warfield's finding that Kierria would be unable to work due to her severe mental health symptoms and treatment plan. The ultimate conclusion that a claimant is disabled or unable to work is an issue reserved to the

27

Commissioner based on the extensive body of law used to arrive at that determination. 20 C.F.R. § 416.927(d). When disability or unemployability is generally and conclusively asserted, as in the letter of support here, the SSA does "not give any special significance to the source of an opinion on issues reserved to the Commissioner . . ." 20 C.F.R. § 416.927(d)(3).

Although Kierria underwent a seven-day hospitalization in May 2014, her regular medical treatment visits between May 2014 and March 2017 typically lasted between fifteen minutes and one hour, at a frequency of one to four times a month. The records demonstrate that once Kierria became compliant with her treatment plan her "manic episodes" were controlled and Kierria became stable. Because the evidence presented fails to show that Kierria's mental health treatment must occur during work hours or that the appointments could not be arranged around a full-time competitive work schedule, the ALJ did not err in not providing further explanation as to how she concluded the Plaintiff could maintain employment while attending her necessary treatment visits.

## B. Whether the ALJ Failed to Give Proper Weight to Treating Medical Providers.

Kierria contends that the ALJ failed to provide support for the little weight she gave to Nurse Stephena Sheets and licensed social worker Charles Warfield. [Dkt. 8 at 4, 26-27.] Kierria also asserts generally that the ALJ did not follow the SSA's guidance on weighing treating sources as articulated in 20 C.F.R. § 404.1527(c). [Id. at 26.] The Commissioner argues that the ALJ reasonably

considered the medical source opinions and gave "good reasons for giving little weight to those opinions." [Dkt. 15 at 14.]

When making a disability determination, an ALJ utilizes all of the available evidence in an individual's case record. SSR 06-03p.[5] "This includes, but is not limited to objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other 'non-medical sources . . .'"[6] Social Security Ruling 06-03p distinguishes between "acceptable medical sources" and other health care providers because only "acceptable medical sources" can establish the existence of a medically determinable impairment, give medical opinions, or be considered treating sources. [Id.] Nurse practitioners, such as Nurse Sheets, and licensed clinical social workers, such as Mr. Warfield, are considered "other medical sources," whose medical opinion may be used to provide "insight into the severity of the [individual's] impairment(s) and . . . [to demonstrate how the impairment] affects the individual's ability to function." SSR 06-03p; § 404.1527(d)(2); *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010).

When evaluating opinions from medical sources who are not "acceptable medical sources," the "weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that

---

[5] This Social Security Ruling was rescinded but is still applicable to all claims filed prior to March 27, 2017.
[6] The term "medical sources" refers to both "acceptable medical sources" and other health care providers who are not "acceptable medical sources." SSR 06-03p.

source's qualifications, the issue(s) that the opinion is about, and many other factors . . ." including: "(1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion." SSR 06-03p.

On March 8, 2017, Nurse Sheets completed a mental impairment questionnaire detailing Kierria's treatment and the impact of her bipolar disorder on daily living. [Dkt. 6-16 at 25-30 (R. 912-16).] In describing Kierria's treatment and the severity of her mental impairment, Nurse Sheets stated that Kierria has a long history of anxiety, depression, and bipolar disorder. [Id. at 25 (R. 912).] She further indicated that Kierria's mood is improved with treatment, but her concentration, forgetfulness, and short-term memory are poor. [Id.] In a medical support statement signed by Nurse Sheets and Mr. Warfield, they noted that Kierria's "psychiatric conditions are severe and continue to markedly impact her social and occupational functioning as well as her activities of daily living." [Dkt. 6-16 at 32 (R. 919).] Nurse Sheets and Mr. Warfield opined that Kierria's symptoms so markedly impact her general functioning that she was not well enough to perform work-related activities because her daily activities were "largely centered around her intense effort to manage her symptoms to avoid decompensations, including having to take frequent breaks during the day to rest or calm down." [Id.]

The ALJ gave little weight to Nurse Sheets' opinion, explaining that she found Nurse Sheets' opinion "simply inconsistent with her actual treatment notes." [Dkt. 6-2 at 26 (R. 25).] In support of her conclusion, the ALJ relies on numerous inconsistencies between Nurse Sheets' opined limitations and her own examination findings. At a September 22, 2014 appointment, Nurse Sheets describes Kierria as "alert and oriented with a good fund of knowledge, appropriate immediate recall, and good abstracting ability." [Dkt. 6-2 at 26 (R. 25) *citing* Dkt. 6-15 at 98 (R. 885).] The ALJ continues, "[a]fter stabilization through treatment, Ms. Sheets never noted significant deficits during mini mental status examinations." [Dkt. 6-2 at 26 (R. 25).] The ALJ noted that Nurse Sheets failed to reference any objective medical evidence to support the physical and mental limitations she opined. [Id.] The ALJ concluded that "due to the lack of any significant objective support for the [Sheets] opinion, it can be given very little weight in assessing the claimant's functional capacity." [Id.]

The ALJ likewise discredited Kierria's treating social worker, Mr. Warfield, who agreed that Kierria suffered from marked limitations in functioning, including her inability to sustain concentration well enough to work. [Dkt. 6-16 at 32 (R. 919).] The ALJ concluded, however, that Mr. Warfield's contention was likewise contradicted by his own treatment notes because "the claimant, for the most part, endorsed stability in her symptoms." [Dkt. 6-2 at 26 (R. 25).]

In disregarding Nurse Sheets and Mr. Warfield's opinion, the ALJ provided legitimate reasons for rejecting the conclusion that Kierria is unable to perform any

type of work activity due to her mental impairments. Citing to objective medical evidence to support the mental limitations in the RFC, the ALJ explained that throughout 2015 and 2016, Kierria remained in services through IU Health and that with ongoing medication management and therapy sessions, she reported stabilization of her mood. [Id. at 24 (R. 23).]

As noted above, mental status examinations consistently showed that Kierria had good hygiene, was well-groomed, exercised a cooperative, friendly, and pleasant attitude, logical, sequential, appropriate, future-oriented, and goal-directed thought processes, easy to understand speech, oriented times four, good insight and judgment, and no suicidal ideation or homicidal ideation. [*See, e.g.*, Dkts. 6-15 at 51, 75, 79, 92 (R. 838, 862, 866, 879); 6-12 at 3 (R. 586).] Kierria's medications were adjusted to address her stressors and resolve her concerns. [Dkts. 6-10 at 71-72 (R. 507-08); 6-14 at 12 (R. 710).] At one point, Kierria reported that her medications were keeping her mood reasonably stable and she was doing well on her medications. [Dkts. 6-15 at 88 (R. 875); 6-10 at 68 (R. 504).] The evidence also consistently notes noncompliance with treatment recommendations. [*See, e.g.*, Dkt. 6-11 at 4 (R. 514) (Kierria "continually emphasized her consistent, daily use of marijuana."); Dkt. 6-11 at 63 (R. 573) (the provider explained that Kierria's use of marijuana would likely "alter psychiatric ability for her to maintain stability with medications."); Dkt. 6-15 at 92 (R. 879) (further issues with not following recommendations regarding marijuana use).]

Although the ALJ did not explicitly discuss each of the factors contemplated in SSR 06-03p and § 404.1527, the ALJ did discuss the nature and extent of the treating relationship of Nurse Sheets and Mr. Warfield, and the consistency of their opinions with the other record evidence. [Id. at 25-26 (R. at 24-25).] The ALJ, therefore, reasonably considered and evaluated the opinions of Nurse Sheets and Mr. Warfield by citing inconsistencies between the opinion and record evidence.

**C. Whether the ALJ Failed to Account for Kierria's Limitations with Managing Stress, Maintaining Concentration, Persistence, or Pace, and Aggression.**

Lastly, Kierria argues that the ALJ failed to account for her social and mental limitations when formulating her RFC. [Dkt. 8 at 29.] Specifically, Kierria contends that the ALJ failed to adequately address her limitations with managing stress, maintaining concentration, persistence, and pace, and managing her anger when determining her ability to maintain regular employment. [Id. at 28-29.]

The Commissioner contends that the ALJ adequately supported her conclusions about Kierria's mental health functioning with stress, anger, and concentration, persistence, and pace, and there is substantial evidence to support her decision. [Dkt. 15 at 21.] The Commissioner maintains that the ALJ, relying on the medical evidence and treatment notes, addressed the Plaintiff's stress triggers and anger issues by limiting Kierria's work to occasional interaction with supervisors, co-workers, and the public and working on simple, repetitive tasks that required only simple decision-making to reduce Kierria's stress. [Dkt. 15 at 18, 20.] The Commissioner also argues that the ALJ adequately accounted for Kierria's

moderate limitations with concentration, persistence, or pace by limiting her to simple, repetitive tasks that required only simple decision-making and no fast-paced assembly line work. [Id. at 18-19.]

SSR 85-15 requires that any impairment-related limitations created by an individual's response to demands of work must be reflected in the RFC assessment. *Clark v. Colvin*, No. 1:14-CV-00834-TWP-DKL, 2015 WL 2342146, at *4 (S.D. Ind. May 14, 2015). Because a person's reaction to stress is highly individualized, "SSR 85-15 requires an ALJ to undertake a subjective, individualized inquiry into what job attributes are likely to produce disabling stress in the claimant, and what, if any, jobs exist in the economy that do not possess those attributes." *Felver v. Barnhart*, 243 F. Supp. 2d 895, 906 (N.D. Ind. 2003).

In *Starks v. Colvin*, the claimant argued that the ALJ failed to address his ability, or lack thereof, to cope with stress in the workplace. No. 1:13-CV-01530-TWP-DKL, 2014 WL 4908112, at *5. The plaintiff suffered from post-traumatic stress disorder, depression, anxiety, and struggled with co-worker interaction, public interaction, and workplace tolerance. *Id*. The Court found that the ALJ sufficiently considered the effects of stress in the workplace because his RFC assessment included a discussion of the "significant social limitations" and aspects of work that would cause the plaintiff disabling stress. *Id*.

Here, Kierria alleges that the ALJ did not account for her inability to handle stress either in the RFC or anywhere in the decision. The Court disagrees. The ALJ did satisfy the requirements of SSR 85-15 by considering the job attributes that

would likely produce stress and aggression in Kierria, and properly incorporated those considerations in the RFC.

Upon review of the record, the Court finds that the ALJ sufficiently adjusted the RFC to accommodate Kierria's limitations that were supported by medical evidence in the record. In her opinion, the ALJ notes that Kierria's past difficulties with mood fluctuations, anxiety, tension, belligerent behavior, manic episodes, and chronic depression were primarily managed with a combination of ECT, therapy, and medication. [Dkt. 6-2 at 27 (R. 26).] She also noted that these issues were adequately addressed when Kierria complied with the medical treatment plan. [Id. at 27-28 (R. 26-27).]

Relying on the opinions of experts, the ALJ found that the record evidence showed that Kierria could understand, carry out, and remember simple, routine, and repetitive tasks, involving only simple work-related decisions and occasional interaction with supervisors, co-workers, and the public. [Id. at 21 (R. at 20).] The assessment also restricted her from participating in fast-moving assembly line work. [Id.] The ALJ gave significant weight to state agency psychological consultant Dr. Maura Clark's opinion, which specifically reported that despite her severe mental impairments, Kierria "retained the mental capacity to understand, carry out, and remember simple instructions, as well as make judgments commensurate with functions of unskilled work" . . . and had the ability to "respond appropriately to brief supervision and interactions with co-workers and work situations." [Id. at 25 (R. 24).] Dr. Clark opined that Kierria could "deal with changes in a routine work

setting." [Id.] Lastly, Dr. Clark and other medical professionals reviewing Kierria's file agreed that with appropriate treatment, Kierria's symptoms improved. [Id.] As noted above, the ALJ gave significant weight to Dr. Clark's opinion that Kierria could perform "unskilled work" and "respond appropriately to brief supervision." The RFC limited Kierria to "simple, routine, and repetitive tasks" and excluded "fast-paced work." [Id. at 21 (R. 20).]

As discussed above, Kierria's stressors and prior impulsive behavior were primarily stabilized by Kierria's compliance with her treatment plan, ongoing therapy sessions, and medication. Citing Dr. Robison's opinion that Kierria was "less than adequately able to speak and behave appropriately, respond to supervisory feedback and instruction, and manage conflicts," the ALJ included social limitations in her RFC assessment. [Dkt. 6-2 at 24 (R. 23).] In addition to the unskilled light work limitation, the ALJ's RFC limited Kierria to occasional interaction with supervisors, co-workers, and the public. [Id. at 21 (R. 20).]

Upon review of the record, the Court finds that the ALJ's RFC assessment adequately considers aspects of work that would exacerbate Kierria's stressors and behavioral issues, and is sufficiently adjusted to accommodate these limitations.

Next, Kierria contends that the ALJ failed to properly account for her moderate limitations in concentration, persistence, or pace when assessing her RFC. [Dkt. 8 at 28.] Specifically, Kierria appears to argue that the hypothetical posed to the vocational expert failed to convey all of her limitations. [Id. at 30.] "In this circuit, both the hypothetical posed to the [vocational expert] and the ALJ's

36

RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *see also Shonda S. v. Berryhill*, No. 1:18-cv-00715-JRS-MJD, 2019 WL 1323922, at *7 (S.D. Ind. Mar. 25, 2019) (*citing Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994)). Among the mental limitations that the vocational expert must consider are deficiencies of concentration, persistence, or pace. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Although it is not necessary that the ALJ use the precise terminology of "concentration, persistence, or pace," the Court does not assume that a vocational expert is apprised of such limitations unless he or she has independently reviewed the medical record. *Shonda S.*, 2019 WL 1323922, at *7.

Providing the vocational expert a faulty hypothetical can render an ALJ's decision unsupported by substantial evidence. *Wilson v. Berryhill*, No. 4:17-cv-00088-TAB-RLY, 2018 WL 300184, at *2 (S.D. Ind. Jan. 5, 2018). In *Varga,* the plaintiff suffered from post-traumatic stress disorder, endometriosis, major depression, irritable bowel syndrome, and fibromyalgia. *Varga v. Colvin*, 794 F.3d 809, 810 (7th Cir. 2015). The plaintiff argued that the hypothetical question posed to the vocational expert during her disability hearing was flawed because it did not adequately account for all of her mental difficulties, including her moderate limitations in concentration, persistence, or pace. *Id*. at 813. The ALJ asked the vocational expert to assume an individual able to perform "simple, routine, or repetitive tasks in a work environment . . . free of fast paced production requirements, involving only simple work-related decisions with few if any work

place [sic] changes and no more than occasional interaction with co-workers or supervisors." *Id.* at 812. The court found that the ALJ committed reversible error in failing to account for the plaintiff's medically documented mental limitations in maintaining concentration, persistence, and pace by posing an incomplete hypothetical. *Id.* at 814.

Relying on the opinions of Dr. Robison and Dr. Clark, the ALJ found Kierria to have moderate limitations with concentration, persistence, or pace. [Dkt. 6-2 at 20 (R. 19).] As noted above, psychologist Dr. Robison examined Kierria in May 2015. [Dkt. 6-12 at 61 (R. 644).] His diagnostic impressions included major depressive disorder, single episode, chronic, severe, with mixed features and borderline personality disorder. [Id. at 64 (R. 647).] With her mental and social limitations, Dr. Robison concluded that Kierria was fully capable of following simple instructions, making simple decisions, and generally capable of creating and maintaining a regular schedule of activities without others' direction or supervision. [Id.] Dr. Robison also observed that Kierria was adequately capable of following complex instructions, making complex decisions, and performing normal personal hygiene tasks and routine domestic tasks. [Id.] On June 8, 2015, Dr. Clark conducted a mental residual functional capacity assessment of Kierria's records, and determined that she was "moderately limited" in three mental functioning areas dealing with concentration and persistence including: (1) the ability to carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; and (3) the ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerance. [Dkt. 6-5 at 10 (R. 183).] Dr. Clark found that Kierria was "not significantly limited" in regard to any of the other five: (1) ability to carry out very short and simple instructions; (2) ability to sustain an ordinary routine without special supervision; (3) the ability to work in coordination with or in proximity to others without being distracted by them; (4) the ability to make simple work-related decisions; and (5) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. [Id.]

Finally, Dr. Clark translated her worksheet observations into an assessment of Kierria's mental residual functional capacity, concluding that Kierria was "able to understand, carry out, and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with co-workers and work situations; able to deal with changes in a routine work setting." [Id. at 12 (R. 185).] Later, on August 6, 2015, state agency psychological consultant, Dr. Donna Unversaw, reviewed Kierria's files and confirmed Dr. Clark's assessment. [Id. at 24 (R. 197).]

In making her RFC determination, the ALJ gave significant weight to the mental residual functional capacity assessments of Drs. Clark and Unversaw. [Dkt. 6-2 at 25 (R. 24).] With no evidence that the vocational expert was familiar with Kierria's medical record, the ALJ's hypothetical needed to fully set forth the claimant's deficiencies of concentration, persistence, and pace. Here, the ALJ's

hypothetical posed to the vocational expert limited Kierria to concentration on simple, routine, repetitive tasks, involving only simple, work-related decisions and excluded the ability to perform detailed instructions. [Id. at 62-67 (R. 61-66).] The RFC also excluded "fast-moving, assembly line work," addressing Kierria's limitation with maintaining attention and concentration for extended periods. [Id. at 21 (R. 20).] The RFC also appropriately limited Kierria to routine work settings addressing her limitation with performing activities within a schedule. [Id.] The ALJ's RFC finding adequately accounted for the limitations she found credible. Accordingly, the Undersigned does not find any issue with either the ALJ's RFC finding, in relevant part, or the hypothetical that was put to the vocational expert in those same terms.

Lastly, Kierria argues that the ALJ failed to incorporate into the RFC her issues with anger and aggressiveness. [Dkt. 8 at 30.] Kierria, however, has failed to support this argument with any citations to the record, but rather only summarizes case law. An argument that is "perfunctory and undeveloped" may be treated as waived. *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018). Moreover, the Magistrate Judge declines to provide an extensive discussion of the ALJ's RFC findings regarding Kierria's issues with anger and aggression, which would largely reiterate the analysis above. The Plaintiff's argument is conclusory and does not establish that the ALJ's RFC findings were not supported by the record.

## V.    CONCLUSION

The standard for disability claims under the Social Security Act is stringent. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. The Court reviews the record as a whole, but does not re-weigh the evidence or substitute its judgment for the ALJ's. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The Court must uphold a decision where, as here, it is supported by substantial evidence – evidence a reasonable mind might accept as adequate – in the record. As the Court cannot find a legal basis to overturn the ALJ's determination that Kierria does not qualify for disability benefits, the Undersigned recommends the ALJ's decision should be **AFFIRMED**.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to timely file objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

So ORDERED.

Date: 1/3/2020

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record.

41